May it please the Court, I'm John Koppel with the Appellate Staff, Civil Division, U.S. Department of Justice, representing the Appellant Department of Agriculture on this appeal, and I hope to reserve at least three minutes of my time for rebuttal. The district court in this case erred in ordering the disclosure of the GPS, that is, Global Positioning System, coordinates that plaintiffs seek with respect to the Mexican wolf program under the FOIA, notwithstanding exemptions three and six to the FOIA. With respect to the exemption three issue, it is clear under this Court's decision in Southwest Center for Biological Diversity v. Department of Agriculture that 7 U.S.C. 8791b2 does indeed apply retroactively to control this case, and therefore it requires reversal of the district court's judgment. But 7 U.S.C. 8791b2 speaks directly to geospatial information, which is precisely what the plaintiffs are seeking here. The plaintiff's sole argument, or the plaintiff's principal argument against that, against application of that provision is that, in their view, it does not apply retroactively because they had already filed their administrative request and it had been acted on by USDA before Congress enacted 7 U.S.C. 8791b2. But that is precisely the type of argument that this Court rejected in Southwest Center for Biological Diversity, where it held that it would apply the general rule that a statute, that the law apply, the Court applies the law in effect at the time of its decision. And that is controlling here. The next question, please.    The exemption 6, the exemption 6, that really, that completely disposes of this case. And I'm prepared to answer any questions that the Court might have on that issue. It doesn't look like we have any. Thank you. The exemption 6 issue is the Court need not reach if it agrees with us that 7 U.S.C. 8791b2 applies here. And that issue is fully set forth in our brief. So if there are no further questions. Why don't you just reserve your time? Let's put the other side out. That's what I will do, Your Honor. Thank you. May it please the Court. My name is Matt Kinney with the Western Environmental Law Center, representing the plaintiff conservation groups. On the retroactivity issue, the Court should look at a case that I failed to cite but that the district court relied on, which is Martin v. Haddox. And it's a U.S. Supreme Court case from 1999, which laid out a retroactivity analysis where it said that unless, if Congress specifies an explicit date, it can't be applied by a court to activity that happened before it. And that was a 1983 civil rights fees case where Congress specified the explicit date and the court applied it only to work that occurred on or after that date. The reason the Southwest Center case does not answer this retroactivity question is because there was no explicit date in the statute issue there. So then that's when the court resorts to judicial balancing rules rather than just going with that explicit date. And the Landsgraf case that we did cite specifically refers to that. I'll point out, too, that regarding the Exemption 3 case, the information that we're arguing over here, the GPS data showing the exact locations of where Mexican wolves have depredated on cattle, this is information that the U.S. Fish and Wildlife Service also has because the Mexican wolf is an endangered species managed by the U.S. Fish and Wildlife Service. And if this law had been in effect when we submitted our request, we would have asked of the Fish and Wildlife Service. And this Farm Bill provision does not apply to U.S. Fish and Wildlife Service. It specifically states that it only applies to the Department of Agriculture, under which APHIS and Wildlife Services lies, which I think also shows as a substantive matter, even if you get past the retroactivity question, that this is not the sort of information that was the scope of that Farm Bill provision because it's not the type of information that a farmer gives to the Department of Agriculture to be involved in its subsidy and other programs. Can I ask a practical question? Why you didn't file a FOIA with the Fish and Wildlife if you could have gotten it from them and not face all these issues? The Farm Bill provision wasn't even a twinkling in Congress's eye when we submitted the FOIA request. And since Wildlife Services, the one that actually goes out and removes wolves from the environment when they depredate on cattle too many times, they are the ones we asked and sued over. And it was bad luck. But it's another reason, again, we don't even get into judicial balancing rules when you have an explicit date like we do here. But if you did, even if we did get into judicial balancing rules, it shouldn't be applied to this case because we relied on the current state of the law as it existed then. And again, that Martin B. Haddock's case. How? By requesting from — By making a request. Right. But if it had been in effect, we would have gone to Fish and Wildlife Service and we wouldn't have had to deal with this. We could have anyway. We could have. But we didn't know that we needed to because Congress hadn't passed the law yet. But again, even if you come down the other way on judicial balancing rules, you don't get there because you have this explicit date that we're talking about. I'll tell you, just as a purely practical matter, what do you need this information for? You've got all sorts of information that was disclosed about the complaints that were made and the actions that were taken and all that stuff. So except for sort of walking on the property, what do you need the information for? Well, the government has tried to portray our request as a means of recreating investigations, and that's not why the plaintiffs want the information at all. It's summarized in the excerpts of record by Eva Sargent of Defenders of Wildlife, at excerpts of record 16 and 33 through 34, and we discussed it in our briefs. But the reason is that only by knowing the precise locations where these depredations take place can then the groups go to the government and argue. For instance, if a lot of the depredations are occurring in a certain area, we could advocate for fencing that out from cattle because maybe there's a particular draw where cattle get stuck and can't escape or wolves are able to triangulate. Because this is one of the biggest barriers to Mexican wolf recovery are these cattle interactions. And so what we're trying to do is reduce the interactions. Besides fencing, there could be remedies such as either retiring grazing leases or urging herding llamas or dogs in there to keep wolves away. So if we can look at the particular geographic information where this is occurring, we can make recommendations to reduce these conflicts with cattle. Isn't that information available by aerial maps photographed of that area? Yeah, we would need to go on the ground. Find the draws and the areas where the cattle might not escape? But we don't know where these are occurring. We don't know the precise locations where the wolves are preying on cattle in particular. And by knowing this information, then we would have a better idea, or we'd have the only idea of what recommendations to make to the government to avoid these conflicts who manages the grazing leases. And this is primarily on public land that we're talking about, public land grazing lease areas in the mountains of Arizona and New Mexico. So there's no restriction for your flying over the public land and photographing if you wish? We can, but that doesn't tell us anything because we can go over and photograph, but we don't know where these depredations are occurring. So we can't say, you know, at XYZ's grazing allotment, you should take these actions which we think will reduce the user conflicts. But you've given us examples of where they might occur, where the cattle can't escape from a draw or what have you. Yes, but, you know, we're talking, you know, millions of acres of land, and if we knew they were clustered in certain areas, then we could make recommendations about those particular areas, not generally what to do about avoiding conflicts. You know, we want to be able to get specific about certain areas. Now, the district court, on the Exemption 6 issue, when it was weighing the balance between the public interest in this information and then the risk of harm from releasing it, made findings, and it found credible the record in the evidence that this was a public interest, that we needed the information for. It likewise found the government's assertion of threat not a credible risk of anything more than speculative harm. And those are factual findings that are due clear error deference. Are you aware of any case where the disclosure of information sought would implicate a name and address, where a court has found the public interest to trump the private interest in privacy? Under the Exemption 6, I was not finding, there's not many cases dealing with a threat of harm under Exemption 6. But under Exemption 7F under FOIA, that's an exemption that allows withholding of law enforcement records, which if released would endanger life or safety. And they're not in the briefs, but I'll read the citation if I might. Wait, the question, my question was, are you aware of any case where the balance between public and private interest has been at stake, and the private interest that is asserted is that the disclosure would inevitably lead to name and address? Are you aware of any case where those facts exist in which a court has held that the public interest trumps the private interest? Oh, absolutely. I mean, one of the primary cases. I haven't found one, so you're absolutely, that's the reason I asked the question. Okay. So if you know of a particular case where that's happened. Yes, Your Honor. Okay. The one case we cited, the National Association of Home Builders, which was a D.C. Circuit case, and that was location of spotted owls that could lead to the revealing those locations and lead to trespassers on the owners of the land. So that's one where the public interest in revealing the locations because the other property owners wanted it to sort of fact check the government's designation of critical habitat for that owl. The public interest in making sure those were accurate trumped the privacy interest at stake, and that's one that we relied on. Now, I will grant you that the privacy threat there was more trespassing rather than threat of injury, and the reason I bring up these seven F cases is because there are ones where specifically the threat of injury was at issue. So in ACLU versus Department of Defense, 389F2nd, 547 at 578 Southern District of New York, 2005, this was Abu Ghraib photos and allegations of harm to troops if the Abu Ghraib photos were released. And the court said, quote, I reject, however, the government's argument that reasoning must stop once a threat to life or safety is discerned. Balancing and evaluation are essential aspects of the judicial function, no less in considering the exemptions of FOIA than in other areas of the law. So that's one where, just like this, the government raised the specter of harm, and the court said, no, you have to have a credible threat, and those are the cases we cited which said the same thing in Ray and Rose and the other cases. Another one is Lawyers Committee versus Department of Treasury, 2008, Westlaw, 4482855 at page 19. That's a Northern District of California 2008 case where that involved petitions by people to get off terrorist watch lists, and the government didn't want to give out the names and the petitions because it was worried that even if someone got off the watch list, you know, others might think they're still terrorists and go after them and harm them. And the court said, Treasury's assertion regarding danger to an applicant upon release of the delisting petitions is nothing more than unsupported speculation. And, again, that's what we have here. We have no evidence. The names of the ranchers largely in Mexican wolf country is well known. Our declaration talks about that. There's been no threats of violence, no violence. There's just the speculation that it could possibly occur. But, again, that would already be occurring because the actors generally are known. Releasing the location data, first of all, of course, would not directly lead to name and property information. Yes, someone could find it with some work, but even if it were, again, it wouldn't increase the risk of harm. And then I'll note the two cases we cited where it said doing this sort of, you know, information without the names often makes ads an adequate safeguard. And in addition to the two district court cases we cited, I'll also point out that was the case in Rose, the Supreme Court case of Rose that's cited throughout the briefs but not cited for this provision where they said releasing information that's one step away from actual names and addresses does add an adequate safeguard on top of the existing analysis. Going back to the Exemption 3 question, you know, we discussed the retroactivity, but if you're going to get to the merits of the terms, you know, we talked about how this Farm Bill provision was largely a reaction to the D.C. Circuit's decision in Multiag versus Department of Agriculture. And, you know, I was reading the introduction to that, and I think it's instructive because the plaintiff in that case, Multiag, was a commercial vendor of agricultural data. And what was ordered to release was information that farmers submitted to qualify for FSA benefits about their operations. So Congress was reacting to a situation where farmers had to submit detailed information about their operations to the Department of Agriculture. And the court ordered this release to a commercial vendor of this information. And what Congress was doing was saying, we don't want that. And in this case, we have nothing like that, nothing that reveals any intimate details about a farmer's private land, mostly dealing with public land here. And the only thing we're seeking is the locations where Mexican wolves are depredating on cattle so we can try and avoid that. I don't know if the Court has any questions about the standard of review, the clear error versus de novo. No. Well, I'll just add one last note, and that's, again, on the threat of violence issue. And I cited the cases where the information was ordered revealed because the courts didn't find a credible enough threat. On the other side, we have cases, the two cases where the courts did order the information withheld. But we think those are both distinguishable. One was U.S. Department of State versus Ray, which was the Haitian refugee case, where if the names of Haitian refugees that were being returned to Haiti were released, their, quote, unquote, dictatorial government might go after them. And there, there was a real record of that potential for harm. There was a monitoring program that the State Department was using to monitor these Haitian refugees, which showed there was a real risk of threat there. And I think we have time for questions.        I'm sorry. I didn't hear you. I didn't hear you. Your time has expired, so if you'd wrap up, please. Okay. Thank you, Your Honor. That's all. Thank you. Mr. Cobble. Thank you, Your Honor. First, I would note that the Abu Ghraib district court, FOTO's district court decision that Plaintiffs' Counsel just alluded to was ultimately reversed by Congress. That was overruled by legislatively. That is the case that received a great deal of attention, I believe, last year, where Congress ultimately precluded release of those photos. So that is hardly good authority for allowing disclosure here. And now turning briefly to the Exemption 6 issue, it's clear under FOIA law that the identity of the requester has absolutely no bearing, nor do the purposes of the request. And the fact that it was a commercial requester in multi-ag had nothing to do with there's nothing in the legislative history indicating that Congress was only concerned with that situation when it enacted the broad language of 7 U.S.C. 8791B2 to preclude disclosure of geospatial information and other information concerning agricultural operations that's provided by participants in Department of Agriculture programs. And turning to the threat here, first also for public interest purposes, the purpose of the requester and the desire to use it to, say, make recommendations to the government is totally irrelevant. The only public interest that's cognizable under FOIA is the interest in informing the public as to the operations and activities of the government and what the government is up to. So, again, the public interest that the plaintiff is seeking is not entitled to any weight in the FOIA calculus. Now, turning to the privacy interests at stake here, there is ample evidence in the record in the declarations of Janet Bucknall and David Bergman to the existence of a very real concern of possible harm to cooperators in wildlife services programs. So no doubt the district court made a finding that there wasn't any. Your Honor, that was not the district court did not make a finding, did not make a factual finding as that term is understood, nor would it have done so in a FOIA case that went off on summary judgment. The district court did express its view that that was speculative, the privacy for purposes of the privacy interest under FOIA, but we would respectfully submit that given the way this court, the Supreme Court, and other courts have analyzed the privacy interest under FOIA, that decision is incorrect as a matter of law. The privacy interest here has also been recognized by the district court in the Doe v. Veneman case that we've cited in our reply brief. And the 230 fed sub second, I believe page 744, that court specifically recognized the danger of harm and it was established by the same type of declarations, USDA declarations, that are at issue here. Moreover, there has been a showing with respect to wildlife services programs around the country that there is indeed a very real risk based on what has been done on the experience of USDA employees. Now, it's true that there's no record with respect to threats or acts of violence against co-operators, but it is certainly reasonable to infer based on the record that does exist regarding the treatment of USDA employees that there is a danger to the private co-operators as well. And this is also underscored by the second declaration of Janet Bucknall, where she points out that in 1999 in New Mexico, people who managed to obtain information regarding the identity of co-operators in New Mexico posted that information, information regarding their names and addresses on the Internet and called that a hall of shame. And obviously that is not only it's intrusive, inherently intrusive of their privacy, but it also it does raise the prospect that some people out there might act against them based on that information. Then there is also evidence in the record regarding in the David Bergman declaration regarding the mountain lion program in Arizona in 2004 where acts of violence, where there were threats against USDA personnel and there were also acts of vandalism and theft and people indeed wound up going to prison for those acts. And then there is further evidence regarding the coyote program and regarding vandalism and the setting of fires directed at USDA property. And then also a flaming torch that was thrown into a USDA supply facility in Pocatello, Idaho. So there is certainly a record here of threatening acts, hostile acts, and violent acts concerning the Wildlife Services Program and the happenstance that the actual violent acts and acts of harassment so far have been specifically directed only at USDA employees. It certainly does not furnish a basis for holding that the threat here is merely speculative. Turning now to the Exemption 3 issue, it's clear under the district court decision in the central plaque that we just sent to the court in our 28-J letter agrees that 7 U.S.C. 8791-B2 does indeed apply retroactively and that is under Supreme Court case law such as Landgraf and Bradley v. School Board of Richmond, which make it clear that the general rule is that the court does apply the law in effect at the time of its decision. And that's particularly true where the case involves injunctive relief or prospective relief as it does here. And there is no conduct of the plaintiffs that was affected that could conceivably be said to have been affected in a way that would make this impermissibly retroactive. So I think that apart from that, we have fully set forth our arguments in our briefs and in the colloquy with this court, and therefore, I would urge the Court to reverse the decision of the district court. Okay. Thank you, Mr. Koppel. Thank you, Mr. Kianna. The matter just argued will be submitted.
judges: Trager, Alarcon, Rymer